JINA L. CHOI (NY Bar No. 2699718)
ERIN E. SCHNEIDER (Cal. Bar No. 216114)
JASON M. HABERMEYER (Cal. Bar No. 226607)
  Email:  habermeyerj@sec.gov
ROBERT L. TASHJIAN (Cal. Bar No. 191007)
  Email:  tashjianr@sec.gov
JOSEPH P. CEGLIO (Cal. Bar No. 225251)
  Email:  ceglioj@sec.gov

Attorneys for Plaintiff
SECURITIES AND EXCHANGE COMMISSION
44 Montgomery Street, Suite 2800
San Francisco, California  94104
Telephone:  (415) 705-2500
Facsimile:  (415) 705-2501

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

SACRAMENTO DIVISION

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | Case No. |
| Plaintiff, | |
| vs. | COMPLAINT |
| HECTOR M. ABSI, JR., | |
| Defendant. | |

Plaintiff Securities and Exchange Commission (the "Commission") alleges:

## SUMMARY OF THE ACTION

1.      This case involves a financial reporting fraud at Marrone Bio Innovations, Inc. ("MBI" or the "Company"), a Davis, California based company that manufactures and markets agricultural products and went public in August 2013.  As the result of a scheme by the Company's Chief Operating Officer and head of sales Hector M. Absi, Jr., MBI deceived investors into thinking that it was a thriving, growing business that was achieving increases in revenue year-over-year.  Beginning in March 2013, at Absi's direction, MBI offered its distributors various sales concessions, primarily the right to return any unsold product, in order to ensure MBI met its projection that it would double its revenue in 2013.  Absi concealed these concessions from MBI's finance and accounting personnel, leading the Company to recognize revenue on these transactions contrary to applicable accounting principles and the Company's stated revenue recognition policies.

2.      Absi's illicit attempts to boost MBI's revenue were not limited to hiding sales concessions.  On one occasion, Absi asked a distributor to provide false documentation that it had received MBI's shipment before the end of MBI's fiscal quarter, not—as it had—after the end of the quarter.  The false documentation allowed MBI to count the revenue from the sale in the earlier period and avoid a potential restatement of its financial statements.  In a different transaction, Absi instructed a subordinate to backdate a shipping document so that MBI could recognize revenue in the current quarter.  On another occasion, when MBI did not have enough of the correct product to fulfill a sale, Absi instructed his subordinates to intentionally ship the wrong product, so that MBI could record revenue in the current quarter.

3.      Absi personally profited from his scheme by receiving more than $350,000 in bonuses, stock sales, and illegitimate expense reimbursements.  Absi abused MBI's expense reporting system by surreptitiously obtaining payment for personal expenses.  To cover up the improper payments, Absi submitted falsified bank and credit card statements to the finance department as justification for the reimbursements.  As a result, MBI incorrectly reported to shareholders how much Absi was paid.

4.    As a result of Absi's deceptions, MBI materially overstated its revenues in its fiscal year 2013 financial statements alone by more than $3 million, totaling nearly 25 percent of its revenue.  When MBI informed investors that its previously-filed financial statements were unreliable, the price of MBI's stock plunged 44 percent.  Absi resigned from MBI in August 2014.

## JURISDICTION AND VENUE

5.    The Commission brings this action pursuant to Sections 20(b), 20(d), and 22(a) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. §§ 77t(b), 77t(d), and 77v(a)] and Sections 21(d) and 21(e) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. §§ 78u(d) and 78u(e)].

6.    This Court has jurisdiction over this action pursuant to Sections 20(b), 20(d)(1), and 22 of the Securities Act [15 U.S.C. §§ 77t(b), 77t(d)(1), and 77v] and Sections 21(d), 21(e), and 27 of the Exchange Act [15 U.S.C. §§ 78u(d), 78u(e), and 78aa].

7.    Defendant, directly or indirectly, made use of the means or instruments of transportation or communication in interstate commerce, or of the mails, or of any facility of a national securities exchange in connection with the transactions, acts, practices, and courses of business alleged in this complaint.

8.    Venue is proper in this District pursuant to Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)] and Section 27(a) of the Exchange Act [15 U.S.C. § 78aa(a)].  From March 2013 through June 2014 (the "Relevant Period"), MBI maintained its principal place of business in this District.  In addition, acts, practices, and courses of business alleged in this complaint occurred within this District.

9.    Intradistrict assignment to the Sacramento Division is proper pursuant to Rule 120(d) of the Court's Local Rules because a substantial part of the events or omissions which give rise to these claims occurred in Yolo County.

## DEFENDANT AND RELEVANT ENTITY

10.    **Defendant Hector M. Absi, Jr.**, age 47, currently resides in Las Vegas, Nevada. Absi served as MBI's Chief Operating Officer from January 2014 until his resignation in August

2014.  Absi previously served as MBI's Vice President of Commercial Operations from October 2012 to January 2014.  In both roles, Absi reported directly to the Chief Executive Officer and was responsible for MBI's sales organization and supply chain department.  Prior to his employment at MBI, Absi worked in various senior sales and marketing positions in both public and private companies in the agricultural industry.  In response to a subpoena for his sworn testimony during the Commission's investigation, Absi asserted his Fifth Amendment privilege against self-incrimination and refused to answer questions.

11.     **Marrone Bio Innovations, Inc.**, based in Davis, California, develops, manufactures, and sells biologically-based products that farmers and growers use to protect crops from pests, including insects, fungus, and nematodes.  Shares of the Company's common stock are registered with the Commission pursuant to Section 12(b) of the Exchange Act.  After its initial public offering on August 1, 2013, MBI shares began trading on the NASDAQ Global Market under the symbol "MBII".  On June 6, 2014, MBI sold additional shares to the public in both "follow-on" and secondary stock offerings.  As a public company, MBI prepared its financial statements in conformity with Generally Accepted Accounting Principles ("GAAP").  During the Relevant Period, MBI was on a calendar fiscal year, meaning that each fiscal quarter ended on the last day of March, June, and September.  The Company's fiscal year ended on December 31.

### FACTUAL ALLEGATIONS

**A.      Absi's Revenue Recognition Scheme**

**1.      Background**

12.     In November 2012, Absi directed MBI's sales organization to forecast sales for the following fiscal year, which began on January 1, 2013.  As a result of the meeting, the sales organization projected that MBI would double its 2012 revenue.  Shortly thereafter, and through the end of 2013, the doubling of 2012 revenues became a key financial figure adopted by the Company's senior leadership, who urged employees to help MBI reach its goal.  As the head of MBI's sales and supply chain organizations, Absi received periodic sales reports over the course

1    of 2013 that closely tracked the Company's progress towards its stated goal of doubling 2012

2    revenues.

3        13.    During the Relevant Period, MBI primarily sold its products to regional

4    distributors, which in turn sold the products to farmers and other growers.  MBI recognized

5    revenue on a "sell-in" basis.  This meant that the Company recognized revenue upon a sale to its

6    distributors rather than upon the sale to the final consumers of its product.  Under GAAP and the

7    Company's accounting policies, however, MBI would not recognize revenue at the time of sale if

8    any contingencies—such as rights of return—were offered.  In that case, according to GAAP and

9    the Company's accounting policies, MBI could only recognize revenue from a sale to a

10   distributor once all such contingencies expired.

11       14.    From at least the first quarter of 2013, and continuing through the second quarter

12   of 2014, Absi conceived of and directed a scheme designed to accelerate revenue recognition and

13   make it appear as though MBI had achieved its stated revenue goal.  Absi's methods were varied

14   but uniform in their intent to inflate MBI's revenues artificially.  In the process, he concealed his

15   scheme from MBI's finance department and MBI's independent auditors.  As a result of Absi's

16   deceptions, MBI improperly recognized more than $4 million in revenue out of $21 million

17   during the Relevant Period.

18       15.    At the heart of Absi's scheme was a particular sales concession known in the

19   agricultural industry as "inventory protection."  Inventory protection allows buyers of agricultural

20   products to manage their economic risk by contractually receiving the right to return all, or any

21   portion, of the buyers' unsold or unused product.  MBI historically had not offered inventory

22   protection to its distributors.  MBI's revenue recognition policies were designed to allow the

23   Company to recognize revenue upon sale to a distributor and thus did not allow for product

24   returns.  With inventory protection, applicable accounting rules required MBI to defer revenue

25   into a later period, either when the distributor sold the product or the distributor's right of return

26   had expired.

27

28

16.     Absi knew, or was reckless in not knowing, that MBI's revenue recognition policies did not allow for product returns and that the applicable accounting rules required that revenue would be deferred on sales to distributors that had been offered inventory protection.

17.     As the head of sales, Absi was responsible for ensuring that MBI's finance department received all information pertaining to the terms of sale with MBI distributors, including any rights of return.  MBI's finance department held quarterly and annual disclosure meetings with Absi and MBI's senior executive team.  The purpose of these meetings was, among other things, to ensure that the Company recorded revenue in accordance with GAAP and its accounting policies.  Each of the participants in these meetings, including Absi, was responsible for answering truthfully and maintaining the integrity of the Company's books and records.  During these meetings, MBI's controller asked if there were any arrangements with distributors that would affect revenue recognition, including any side deals or concessions.  At each meeting, despite having offered inventory protection, Absi answered that no such arrangements existed.  Absi's failure to disclose the terms of the inventory protection caused the Company to recognize the revenue as of the date of the sale to the distributors, instead of deferring the revenue into later periods when the distributor completed sales to farmers or other growers.

### 2.     The Beginnings of Absi's Inventory Protection Scheme

18.     Despite MBI's revenue recognition policies, Absi offered inventory protection to close a sale to a Northern California distributor in the first quarter of 2013, before MBI's initial public offering.  The distributor had previously purchased only small amounts of product from MBI.  As an incentive for the distributor to make larger purchases, Absi offered inventory protection on additional quantities.  In an email to Absi, the distributor's purchasing manager asked, "[A]nd inventory protection if we still have pallets in September correct?"  Absi responded affirmatively, confirming that the distributor would be permitted to return unsold product.  Absi continued to offer inventory protection on subsequent transactions with the same distributor throughout 2013 and into the first two quarters of 2014.

19.     Absi knew, or was reckless in not knowing, that GAAP and MBI's revenue recognition policies required the Company to defer the revenue from the sales to the Northern

California distributor into later periods because of the inventory protection that he authorized.  To ensure revenue was recognized in the current period, however, Absi concealed the presence of inventory protection on the transactions with the distributor from MBI's finance department.

### 3.      Absi's Scheme Intensifies as Year-End 2013 Approaches

20.     On September 12, 2013, following its August initial public offering, MBI held its first conference call with stock analysts and other market participants.  On the call, MBI management stated that the Company projected $14 million in revenue in 2013.  This figure—double MBI's $7 million revenue in 2012—was the only financial guidance that management provided to the market.  Absi, who participated in the conference call, responded to a question from an analyst and confirmed that MBI was "on track to double the business" from the previous year.  The price of MBI's stock responded positively following the conference call.  The stock, which was offered at a price of $12 per share in the Company's initial public offering, closed as high as $19.38 per share in October before ending the year at $17.78 per share on December 31, 2013.

21.     Towards the end of 2013, Absi became concerned that MBI would not meet its publicly-stated goal to double the Company's annual revenue.  Absi knew that MBI's distributors were reluctant to buy more of MBI's products out of concern that they could not sell it to farmers and other growers.  To meet the revenue goal and to sell as much product as possible by the end of the year, Absi instructed an MBI sales director to offer inventory protection to distributors.  When the executive questioned Absi's directive, Absi falsely claimed that MBI's Chief Executive Officer had authorized the inventory protection.  Over the last week of December 2013, Absi and his sales team offered inventory protection in an effort to close sales, including on four key transactions described below.

#### *Sale to an Ames Distributor*

22.     In late December 2013, an MBI sales employee approached an Ames, Iowa distributor on a large potential sale.  A vice president of the distributor insisted that inventory protection be part of the transaction because MBI's product was new and he was not sure how

1   quickly, if at all, he could sell the product to his customers.  Absi personally approved the offer of

2   inventory protection.

3          23.     The MBI sales employee emailed the terms to MBI's customer relations manager,

4   who reported directly to Absi and was often the "go-between" for the sales organization to the

5   finance department.  The sales employee asked her to draft a term sheet for Absi to execute on

6   behalf of the Company.  The document memorialized the terms of sale for a seven-truckload

7   purchase of MBI product.  One of the terms was captioned "Inventory Protection."  It provided

8   that, to the extent that any product remained at the conclusion of the 120-day period, MBI would

9   either credit the distributor and remove the inventory from the distributor's warehouse, or MBI

10  would retake title to the product and pay the distributor a warehousing fee.

11         24.     Absi instructed the customer service manager to put the term sheet in her office

12  desk drawer and not to show it to anyone.  During the annual disclosure meeting with MBI's

13  finance department, Absi lied about his knowledge of any agreement to offer inventory

14  protection.

15         25.     As a result, MBI improperly recognized approximately $870,000 in revenue from

16  the transaction in its 2013 year-end financial statements.  Absi knew, or was reckless in not

17  knowing, that the revenue from the sale was included in MBI's 2013 financial statements.  Absi

18  also knew, or was reckless in not knowing, that GAAP and MBI's revenue recognition policies

19  required the Company to defer the revenue into a later period as a result of the inventory

20  protection that he authorized and hid from the finance department.

21                                   ***Sale to a Clear Lake Distributor***

22         26.     In the final days of December 2013, Absi directly negotiated another sale of

23  product with a Clear Lake, Iowa distributor.  The distributor had made previous purchases in

24  March and September 2013, most of which the distributor still had in stock at the end of

25  December.  In an email exchange with the distributor's president, Absi convinced the distributor

26  to make another large purchase by offering the distributor inventory protection.  Absi failed to

27  disclose the inventory protection during the annual disclosure meeting with MBI's finance

28  department.

27.     As a result, MBI improperly recognized approximately $692,000 in revenue from the transaction in its 2013 year-end financial statements.  Absi knew, or was reckless in not knowing, that the revenue from the sale was included in MBI's 2013 financial statements.  Absi also knew, or was reckless in not knowing, that GAAP and MBI's revenue recognition policies required the Company to defer the revenue into a later period as a result of the inventory protection that he authorized and hid from the finance department.

### Sale to a Delaware Distributor

28.     Following Absi's directive, an MBI sales director contacted a Delaware distributor in December 2013 and offered inventory protection on two truckloads of product.  The distributor accepted the offer and agreed to purchase the product.  In an email to Absi, the MBI sales director communicated the terms of the deal and stated that he "did have to offer inventory protection" to complete the sale.

29.     Absi failed to disclose the inventory protection during the annual disclosure meeting with MBI's finance department.  As a result, MBI improperly recognized approximately $318,000 in revenue from the transaction in its 2013 year-end financial statements.  Absi knew, or was reckless in not knowing, that the revenue from the sale was included in MBI's 2013 financial statements.  Absi also knew, or was reckless in not knowing, that GAAP and MBI's revenue recognition policies required the Company to defer the revenue into a later period as a result of the inventory protection that he authorized and hid from the finance department.

### Sale to a Central California Distributor

30.     On December 30, 2013, Absi held a conference call with all MBI sales employees and instructed them to offer inventory protection to any distributor willing to buy a half truckload or more of MBI product.  Immediately following the call, one of MBI's sales representatives cut short his family's holiday vacation and returned home to meet with a distributor in the California Central Valley in order to convince the distributor to buy more product before the end of the year.

31.     The distributor's business manager agreed to an additional purchase with inventory protection.  The distributor sent a purchase order on December 30 to MBI that reflected the inventory protection in the terms.  MBI's controller noticed the reference to inventory

protection on the purchase order and asked Absi about it.  Absi falsely stated that inventory protection was not a term of the deal.  At Absi's direction, MBI's customer service manager obtained a revised purchase order from the distributor without any reference to inventory protection, although it remained a term of the sale.  Absi knew that the revised purchase order, without any indication of inventory protection, was provided to the finance department for its review of the sale.

32.     Absi failed to disclose the inventory protection during the annual disclosure meeting with MBI's finance department.  As a result, MBI improperly recognized approximately $81,000 in revenue from the transaction in its 2013 year-end financial statements.  Absi knew, or was reckless in not knowing, that the revenue from the sale was included in MBI's 2013 financial statements.  Absi also knew, or was reckless in not knowing, that GAAP and MBI's revenue recognition policies required the Company to defer the revenue into a later period as a result of the inventory protection that he authorized and hid from the finance department.

### *Sale to a Michigan Distributor*

33.     Absi continued to offer inventory protection to MBI distributors in 2014.  At the end of the first quarter of 2014, in an effort to make up a revenue shortfall relative to internal sales forecasts, Absi authorized one of MBI's sales representatives to offer inventory protection on a sale to a Michigan distributor.  The inventory protection allowed the distributor to pay MBI as it sold product through to its own customers, even beyond the stated payment terms between MBI and the distributor.

34.     Absi failed to disclose the inventory protection during the quarterly disclosure meeting with MBI's finance department.  As a result, MBI improperly recognized approximately $144,000 in revenue from the transaction in its first quarter 2014 financial statements.  Absi knew, or was reckless in not knowing, that the revenue from the sale was included in MBI's first quarter financial statements.  Absi also knew, or was reckless in not knowing, that GAAP and MBI's revenue recognition policies required the Company to defer the revenue into a later period as a result of the inventory protection that he authorized and hid from the finance department.

**4.  Absi Took Other Deceptive Steps to Inflate MBI's Revenue**

35.    Absi's deceptions were not limited to the offer of inventory protection.  For example, in October 2013, MBI's controller began a review of the Company's distributor contracts.  The controller focused on a sale to the Clear Lake, Iowa distributor in the first quarter of 2013.  The bill of lading indicated that the product arrived at the distributor's facility on April 1, 2013.  Under GAAP and the Company's accounting policies, the revenue from the sale should have been recognized upon the delivery of the product to the distributor, meaning that MBI should have recognized revenue from the sale in the second quarter of 2013, not in the first quarter.

36.    MBI's senior leadership, including Absi, discussed the controller's view that revenue from the Clear Lake distributor might have to be deferred into another quarter and questioned whether MBI would have to restate its financial statements.  Away from the other executives, Absi contacted the president of the Clear Lake distributor to fabricate a story about the timing of the delivery.  Absi asked the distributor's president if he would be willing to say that the MBI product had actually arrived on March 31, the last day of MBI's fiscal quarter.  When he made the request, Absi knew, or was reckless in not knowing, that the distributor had actually received the MBI product on April 1.

37.    With the distributor's assent, Absi ghost-wrote an email for the distributor's president.  The email gave the false appearance that (1) the email was written in the distributor's own words and (2) confirmed that the MBI product had arrived before the end of the quarter.  The distributor's president sent the email to Absi, who then forwarded it to MBI's controller and Chief Financial Officer.  Absi did not tell them or anyone else in MBI's finance department that he had written the email for the distributor or that he knew that the email was not true.  MBI, relying on the email, took no further action to restate its financial statements or reverse the revenue from the sale.

38.    Absi engaged in other deceptive conduct with respect to a transaction that was entered into in the third quarter of 2013.  At the end of September 2013, Absi negotiated the largest sale in MBI's history with the Clear Lake, Iowa distributor.  MBI's supply chain

1   organization, which Absi oversaw, notified Absi that MBI did not have enough product on hand

2   to fulfill the order.  In an effort to recognize revenue on the sale, Absi directed the supply chain

3   department to ship a different product to the distributor.

4        39.   By March 2014, the Clear Lake distributor realized they had received the wrong

5   product and returned it to MBI.  When MBI's controller learned of the return, Absi and the

6   customer service manager falsely told her that it was a "mistake."  In May 2014, Absi gave a

7   similarly false explanation to MBI's independent auditors when asked why the supply chain

8   shipped the wrong product.  Absi knew, or was reckless in not knowing, that the wrong product

9   had not been shipped mistakenly.

10       40.   As a result of these falsehoods, MBI's first quarter 2014 financial report

11  erroneously disclosed a "material weakness" in controls.  The Company's report characterized the

12  material weakness as a "shipping error."  In fact, MBI's internal controls governing the supply

13  chain organization were effective—the "error" was the result of Absi's intentional override of

14  MBI's internal controls for the purpose of improperly recognizing revenue.

15       41.   In another instance, Absi and a sales representative completed a sale to the

16  Michigan distributor on March 31, the last day of the first quarter of 2014.  They were told by

17  MBI's supply chain personnel, however, that it was too late to ship the order before the end of the

18  quarter.  In response, Absi instructed the supply chain employees to make it appear as though the

19  product was shipped on March 31.  The MBI supply chain employees refused.  At Absi's

20  direction, MBI's customer service manager arranged for a freight shipping company—a company

21  that she partly owned—to ship the product and backdate a bill of lading to make it appear as

22  though the shipment had occurred on the last day of the quarter.  Absi knew that the backdated

23  bill of lading was provided to the finance department for its review of the sale.

24       42.   Neither Absi nor the customer service manager informed MBI's finance

25  department that the backdated shipping documents contained materially false information.  As a

26  result, MBI recognized revenue from the transaction in its first quarter of 2014 financial

27  statements.  Absi knew, or was reckless in not knowing, that the revenue from the sale was

28  included in MBI's first quarter financial statements.  Absi also knew, or was reckless in not

knowing, that GAAP and MBI's revenue recognition policies required the Company to defer the revenue into a later period because the Company had not shipped the product in the first quarter.

43.     Finally, in a separate transaction, Absi instructed MBI's customer service manager to charge warehousing fees to her personal credit card and falsely characterize the fees in reimbursement requests to the Company as sales promotional expenses.  The reimbursement request resulted in an expense charged to MBI's income statement, instead of an offset to MBI's revenue for the first quarter of 2014, as required under GAAP.  Absi knew, or was reckless in not knowing, that the mischaracterization of the payment allowed MBI to recognize the warehousing fees as an operating expense instead of an offset to MBI's revenue for the first quarter of 2014.

**5.     Absi Hid Sales Concessions From Accountants and Auditors**

44.     In addition to failing to disclose the existence of inventory protection during MBI's quarterly and annual disclosure meetings, Absi took other steps to conceal the existence of inventory protection from MBI's finance department and MBI's independent auditors.

45.     First, in connection with the auditors' year-end audit for 2013, MBI's controller prepared and sent terms and conditions confirmations to selected distributors, requesting that they each verify specific terms of their sales transactions with MBI.  The controller asked Absi to review the confirmations for accuracy before sending them on to the distributors.  In his interactions with the controller about the confirmations, Absi failed to tell her about the inventory protection that he authorized or any other sales concessions, such as agreeing to pay storage fees for a distributor.  Accordingly, none of these terms were included in the confirmations that were sent to MBI's distributors.

46.     Second, also in connection with the auditors' year-end audit for 2013, Absi represented in writing to the auditors that he was not aware of any side agreements with distributors.  Absi certified that all terms and conditions of sales were stated in MBI's written agreements and purchase orders with distributors.  He also certified that he was not aware of any "side agreements," or agreements with distributors that were not reflected in the contracts and purchase orders that he and his sales organization had provided to MBI's finance department.

47.     Absi's representations to the auditors were false:  he knew that he and others on his sales team, at his direction, had offered inventory protection as a term of the sales to distributors and that these side agreements had not been provided to MBI's finance department. And, contrary to his representations to the auditors, Absi knew, or was reckless in not knowing, that the terms of the inventory protection and other concessions, such as payment of warehousing fees and freight charges, were not included in purchase orders or other documents provided to MBI's finance department.  As a result, Absi was able to conceal the inventory protection and other sales concessions from both MBI's finance department and MBI's independent auditors.

**6.     The Financial Effects of Absi's Scheme**

48.     On March 6, 2014, MBI released its 2013 financial results to the public, announcing that its revenue for the full year totaled $14.5 million.  Absi personally touted the "doubling of revenue in 2013" on a conference call with investors and stock analysts.  Absi knew, or was reckless in not knowing, that the statement was materially false and misleading due to the fact that MBI had improperly recognized millions of dollars in revenue.  In the fourth quarter alone, approximately half of the $6 million in reported sales contained inventory protection, which allowed MBI to meet its target to double revenues from 2012.  Without Absi's directive to offer inventory protection on the sales transactions, MBI would have missed its revenue goals for 2013.

49.     Ultimately, MBI improperly recognized revenue in connection with at least 11 transactions over the Relevant Period, totaling just over $4 million, each of which contained a form of inventory protection as a term of the agreement.  The recognition of revenue from these transactions was contrary to GAAP:  the applicable accounting principles and MBI's revenue recognition policies required MBI to defer the revenue into later periods.  As a result, the Company's general ledger, financial statements, and Commission filings reflected revenue in incorrect periods.

50.     The following table identifies the periods that were affected by Absi's revenue recognition scheme, along with the amount and the MBI filings that incorporated the materially false and misleading financial results:

| Period | Revenue Overstatement | Percentage Overstatement | Affected Filings |
|--------|----------------------|--------------------------|------------------|
| 1Q 2013 | $261,756 | 11% | Form S-1 (filed 07/01/13, as amended)<br>Form S-8 (filed 09/06/13)<br>Form 8-K (filed 05/13/14)<br>Form 10-Q (filed 05/15/14) |
| 2Q 2013 | $261,756 | 6% | Form 8-K (filed 09/12/13)<br>Form 10-Q (filed 09/13/13)<br>Form 8-K (filed 08/07/14)<br>Form 10-Q (filed 08/13/14) |
| 4Q 2013 | $2,925,098 | 96% (4Q 2013)<br>25% (FY 2013) | Form 8-K (filed 03/06/14)<br>Form 10-K (filed 03/25/14)<br>Form S-1 (filed 05/16/14, as amended) |
| 1Q 2014 | $464,426 | 20% | Form 8-K (filed 05/13/14)<br>Form 10-Q (filed 05/15/14) |
| 2Q 2014 | $158,976 | 5% | Form 8-K (filed 08/07/14)<br>Form 10-Q (filed 08/13/14) |
| **Total:** | **$4,072,012** | | |

51.     Absi knew, or was reckless in not knowing, that MBI's financial reports, as described in the chart above, were materially false and misleading at the time that they were filed with the Commission.

**7.     Absi Profited From His Scheme**

52.     Following the end of what it thought was a successful year, MBI promoted Absi to the newly-created position of Chief Operating Officer.  MBI issued a press release on or about January 14, 2014 announcing Absi's promotion and citing his "leadership" and his role in "significantly increas[ing] our 2013 sales."  The Company rewarded Absi with a bonus in the amount of $49,668, paid on the day after financial results for 2013 were publicly released in March 2014.  Almost 25 percent of Absi's bonus was tied directly to achieving MBI's revenue target.

53.     Absi also profited by exercising his employee stock options, which he received as part of his compensation from MBI.  Absi devised a plan to exercise his stock options at some point after he initiated his scheme to conceal the offer of inventory protection from MBI's finance department.  On or about December 13, 2013, Absi signed a "Rule 10b5-1 Sales Plan," in which he made the express representation that he was "not aware of any material nonpublic information" concerning MBI.

54.     Absi's representation in the plan was false at the time he entered into the plan:  as he knew, MBI's sales organization had offered inventory protection to distributors.  Absi hid the terms of the inventory protection from MBI's finance department and knew, or was reckless in not knowing, that the Company had improperly recognized revenue from the transactions, contrary to GAAP and its accounting policies.  By virtue of his position as head of sales, Absi knew or was reckless in not knowing how close the Company was to meeting its sales goal of doubling 2012 revenues by the end of 2013.  Absi also knew that he could continue his effort to complete additional transactions by the end of 2013—which he did in regard to transactions that accounted for nearly $3 million in revenue in the following 18 days.

55.     On or about January 29, 2014, the first opportunity provided in the plan, Absi exercised more than 98 percent of his vested employee stock options.  As a result, Absi purchased approximately 26,250 shares of MBI stock at $6.28 per share and immediately sold all of the shares at $17.00 per share, the prevailing market price.  In total, Absi received net proceeds—the difference between the sale price and the exercise price of the stock options—of more than $281,000.

**B.     Absi Falsified Expense Reports**

56.     In addition to his revenue recognition scheme, from approximately January 2013 through July 2014, Absi exploited MBI's software system designed to reimburse employees for expenses they incurred on behalf of the Company.  Absi electronically imported his debit card purchases into the MBI software system and discovered that he could change the description of the purchases in the system to make it appear as if his personal expenditures were, in fact, business expenditures.  For example, Absi made it appear that his purchase and installation of Christmas lights at his home was, instead, an out of pocket expenditure for a business-related event to host potential buyers of MBI products.

57.     Absi also instructed the MBI customer service manager to make purchases on his behalf, with her own funds.  At his direction, she made up false and misleading descriptions on MBI expense reports to make it appear as though the expenses had legitimate business purposes and obtain reimbursement from the Company.  For example, Absi and the customer service

1  manager created a phony invoice from a distributor for a non-existent promotional sales meeting.

2  At Absi's direction, the customer service manager submitted the invoice to MBI to obtain

3  payment for the purchase of soccer jerseys for Absi's own use.

4      58.    Absi took affirmative steps to cover up his expense report abuse.  During the 2013

5  year-end close process, MBI's finance department reviewed certain expense reports.  The finance

6  department asked Absi to provide bank and credit card statements supporting selected expense

7  items.  MBI's customer service manager, at Absi's direction, altered Absi's bank and credit card

8  statements to hide the nature of the expenses and the fact they were personal, thereby misleading

9  MBI's finance department into thinking that they were legitimate business expenses.

10     59.    In preparation for the filing of its annual report and proxy statement in 2014, MBI

11 asked Absi to complete a "Directors and Officers Questionnaire."  The questionnaire requested

12 Absi, as an officer of the Company, to provide information concerning his compensation,

13 including perks and other personal benefits.  Absi signed and returned the questionnaire without

14 listing or otherwise identifying any of the personal items and expenses for which he had illicitly

15 obtained payment from the Company.

16     60.    In February 2014, MBI's independent auditors expressed concerns about the

17 Company's expense reimbursement process.  When MBI's Chief Executive Officer asked Absi

18 about some of his reimbursements, Absi maintained he had done nothing wrong.  He wrote in an

19 email: "I want to reassure you that there has been absolutely nothing intentional done to try to

20 cheat the system or benefit from the system.  I want you to be confident of this fact!  No one is

21 going to make a living of cheating an expense report system.  It is a ludicrous concept."

22     61.    In total, however, Absi obtained reimbursement for over $35,000 of personal

23 expenses in 2013 and 2014, including clothing, furniture, personal travel, and student loan

24 repayments.

25     62.    MBI filed its 2013 annual report with the Commission on March 25, 2014, and its

26 2014 proxy statement on April 25, 2014.  In both filings, MBI provided a table of compensation

27 reflecting the amounts that the Company paid its executives in 2013, including their salary,

28 bonus, value of stock grants, and "All Other Compensation."  The table should have included the

1  amount that Absi illicitly obtained from MBI for his personal expenses in 2013.  Had MBI

2  properly disclosed this amount—$25,098—the total in the column for Absi's "All Other

3  Compensation" would have nearly doubled.  Absi knew, or was reckless in not knowing, that his

4  abuse of MBI's expense reimbursement system led the Company to understate his compensation

5  in its filings.

6        **C.      Absi's Scheme Is Revealed**

7        63.    MBI was unable to sustain its more-than-doubling sales growth in 2014, which led

8  to large revenue shortfalls in the first and second quarters of 2014.  Anticipating another large

9  revenue shortfall in the third quarter of 2014, Absi abruptly resigned as MBI's Chief Operating

10 Officer two days before the Company's earnings call on August 7, 2014.

11       64.    One week later, a former MBI employee emailed MBI's Chief Marketing Officer

12 about the inventory protection that had been offered to the distributor in Ames, Iowa.  The email

13 attached an unsigned version of the December 2013 side letter with the Ames distributor that Absi

14 had directed MBI's customer service manager to hide in her office desk drawer.  Shortly

15 thereafter, MBI's Audit Committee began an internal investigation relating to its accounting

16 practices.

17       65.    MBI issued a press release on September 3, 2014, announcing the internal

18 investigation.  The Company further warned investors that the Company's financial statements

19 for fiscal year 2013 and the first and second quarters of 2014 should not be relied upon.  In

20 response to the news, MBI's stock dropped to its then-lowest price at the close of trading,

21 plummeting 44 percent.  MBI's stock traded even lower in the days following the announcement

22 and has not regained its pre-September 3, 2014 price per share.

23       66.    On November 10, 2015, MBI filed restated financial statements for the periods of

24 the first quarter of 2013 through the second quarter of 2014 and announced the findings of the

25 Audit Committee of its Board of Directors.  In its restatement, the Company announced that the

26 Audit Committee determined that it "inappropriately recognized revenue" principally as a result

27 of "inventory protection arrangements" that permitted distributors to return unsold product.  In

28 the restatement, MBI reversed approximately $2 million in previously reported revenue.

**FIRST CLAIM FOR RELIEF**

*Violations of Sections 17(a)(1), (2), and (3) of the Securities Act*

67.     The Commission hereby incorporates Paragraphs Nos. 1 through 66 by reference.

68.     By engaging in the conduct described above, defendant Absi directly or indirectly, in the offer or sale of securities, by use of the means or instruments of transportation or communication in interstate commerce or by use of the mails,

    (1)     with scienter, employed devices, schemes, and artifices to defraud;

    (2)     obtained money or property by means of untrue statements of material fact and by omitting to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and

    (3)     engaged in transactions, practices, or courses of business that operated or would operate as a fraud or deceit upon purchasers.

69.     By reason of the foregoing, defendant Absi violated and, unless restrained and enjoined, will continue to violate Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)].

**SECOND CLAIM FOR RELIEF**

*Violations of Section 10(b) of the Exchange Act and*
*Rules 10b-5(a), (b), and (c) Thereunder*

70.     The Commission hereby incorporates Paragraphs Nos. 1 through 66 by reference.

71.     By engaging in the conduct set forth above, defendant Absi directly or indirectly, by use of means or instrumentalities of interstate commerce, or of the mails, or of a facility of a national securities exchange, in connection with the purchase or sale of securities, with scienter,

    (a)     employed devices, schemes, and artifices to defraud;

    (b)     made untrue statements of material fact and omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and

    (c)     engaged in acts, practices, and courses of business that operated or would operate as a fraud or deceit upon any person.

72.     By reason of the foregoing, defendant Absi violated and, unless restrained and enjoined, will continue to violate Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

### THIRD CLAIM FOR RELIEF

#### *Violations of Section 13(b)(5) of the Exchange Act*

73.     The Commission hereby incorporates Paragraphs Nos. 1 through 66 by reference.

74.     By the conduct alleged above, defendant Absi violated Section 13(b)(5) of the Exchange Act [15 U.S.C. § 78m(b)(5)], which prohibits anyone from knowingly circumventing a system of internal accounting controls, knowingly failing to implement a system of internal accounting controls, or knowingly falsifying required books, records, and accounts.

75.     By reason of the foregoing, defendant Absi violated and, unless restrained and enjoined, will continue to violate Section 13(b)(5) of the Exchange Act [15 U.S.C. § 78m(b)(5)].

### FOURTH CLAIM FOR RELIEF

#### *Violations of Rule 13b2-1 of the Exchange Act*

76.     The Commission hereby incorporates Paragraphs Nos. 1 through 66 by reference.

77.     By engaging in the conduct described above, defendant Absi falsified and caused to be falsified MBI's required books, records, and accounts, in violation of Exchange Act Rule 13b2-1 [17 C.F.R. § 240.13b2-1].

78.     By reason of the foregoing, defendant Absi violated and, unless restrained and enjoined, will continue to violate Exchange Act Rule 13b2-1 [17 C.F.R. § 240.13b2-1].

### FIFTH CLAIM FOR RELIEF

#### *Violations of Rule 13b2-2 of the Exchange Act*

79.     The Commission hereby incorporates Paragraphs Nos. 1 through 66 by reference.

80.     By engaging in the acts and conduct alleged above, defendant Absi, as an officer, directly or indirectly, made or caused to be made a materially false or misleading statement and omitted to state or caused another person to omit to state, material facts necessary in order to make a statement made, in light of the circumstances under which such statements was made, not misleading to an accountant in connection with an audit or examination of the financial

statements of an issuer required to be made, or the preparation or filing of reports required to be filed, by the issuer with the Commission.

81.     By reason of the foregoing, defendant Absi violated and, unless restrained and enjoined, will continue to violate Exchange Act Rule 13b2-2 [17 C.F.R. § 240.13b2-2].

### SIXTH CLAIM FOR RELIEF

*Aiding and Abetting*
*Violations of Section 13(a) of the Exchange Act and*
*Rules 12b-20, 13a-1, 13a-11, 13a-13 Thereunder*

82.     The Commission hereby incorporates Paragraphs Nos. 1 through 66 by reference.  As described above, MBI's filings with the Commission, including its reports filed on Forms 8-K, Forms S-1, Forms 10-Q, and Forms 10-K, incorporated inaccurate and misleading financial information concerning the Company's revenue.

83.     Based on the conduct alleged above, MBI violated Section 13(a) of the Exchange Act [15 U.S.C. § 78m(a)] and Rules 12b-20, 13a-1, 13a-11, and 13a-13 thereunder [17 C.F.R. §§ 240.12b-20, 240.13a-1, 240.13a-11, 240.13a-13], which obligate issuers of securities registered pursuant to Section 12 of the Exchange Act [15 U.S.C. § 78*l*] to file with the Commission periodic reports, including annual reports, with information that is accurate and not misleading.

84.     By engaging in the acts and conduct alleged above, defendant Absi knowingly and recklessly provided substantial assistance to MBI's filing of misleading reports with the Commission.

85.     By reason of the foregoing, defendant Absi aided and abetted violations of Section 13(a) of the Exchange Act [15 U.S.C. § 78m(a)] and Rules 12b-20, 13a-1, 13a-11, and 13a-13 thereunder [17 C.F.R. §§ 240.12b-20, 240.13a-1, 240.13a-11, 240.13a-13], and unless restrained and enjoined, will continue to aid and abet such violations.

## SEVENTH CLAIM FOR RELIEF

### *Aiding and Abetting*
### *Violations of Section 13(b)(2)(A) of the Exchange Act*

86.     The Commission hereby incorporates Paragraphs Nos. 1 through 66 by reference.  As described above,  MBI's general accounting ledger inaccurately reflected revenue from the Company's transactions.

87.     Based on the conduct alleged above, MBI violated Section 13(b)(2)(A) of the Exchange Act [15 U.S.C. § 78m(b)(2)(A)], which obligates issuers of securities registered pursuant to Section 12 of the Exchange Act [15 U.S.C. § 78*l*] to make and keep books, records, and accounts which, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the issuer.

88.     By engaging in the acts and conduct alleged above, defendant Absi knowingly and recklessly provided substantial assistance to MBI's failure to make and keep books, records, and accounts which, in reasonable detail, accurately and fairly reflect its transactions and dispositions of its assets.

89.     By reason of the foregoing, defendant Absi aided and abetted violations of Section 13(b)(2)(A) of the Exchange Act [15 U.S.C. § 78m(b)(2)(A)], and unless restrained and enjoined, will continue to aid and abet such violations.

## EIGHTH CLAIM FOR RELIEF

### *Aiding and Abetting*
### *Violations of Sections 13(b)(2)(B) of the Exchange Act*

90.     The Commission hereby incorporates Paragraphs Nos. 1 through 66 by reference. As described above, MBI's system of internal accounting controls was insufficient to ensure that revenue from transactions was recorded in accordance with the Company's accounting policies and generally accepted accounting principles.  In addition, MBI's system of internal accounting controls was insufficient to ensure that the Company reimbursed employees only for business-related expenses.

91.     Based on the conduct alleged above, MBI violated Section 13(b)(2)(B) of the Exchange Act [15 U.S.C. § 78m(b)(2)(B)], which obligates issuers of securities registered pursuant to Section 12 of the Exchange Act [15 U.S.C. § 78*l*] to devise and maintain a sufficient system of internal accounting controls.

92.     By engaging in the acts and conduct alleged above, defendant Absi knowingly and recklessly provided substantial assistance to MBI's failure to devise and maintain a sufficient system of internal accounting controls.

93.     By reason of the foregoing, defendant Absi aided and abetted violations of Section 13(b)(2)(B) of the Exchange Act [15 U.S.C. § 78m(b)(2)(B)], and unless restrained and enjoined, will continue to aid and abet such violations.

## NINTH CLAIM FOR RELIEF

### *Aiding and Abetting*
### *Violations of Section 14(a) of the Exchange Act and*
### *Rules 14a-3 and 14a-9 Thereunder*

94.     The Commission hereby incorporates Paragraphs Nos. 1 through 66 by reference.  As described above, MBI's proxy statements incorporated false and misleading information concerning its executive compensation.

95.     Based on the conduct alleged above, MBI violated Section 14(a) of the Exchange Act [15 U.S.C. § 78n(a)] and Rules 14a-3 and 14a-9 thereunder [17 C.F.R. §§ 240.14a-3 and 240.14a-9], which prohibits solicitations by means of a proxy statement, form of proxy, notice of meeting or other communication, written or oral, that fails to contain required information concerning executive compensation or contain a statement which, at the time and in the light of the circumstances under which it was made, was false or misleading with respect to any material fact, or which omit to state any material fact necessary in order to make the statements therein not false or misleading or necessary to correct any statement in any earlier communication with respect to the solicitation of a proxy for the same meeting or subject matter, which had become false or misleading.

96.     By engaging in the conduct alleged above, defendant Absi knowingly and recklessly provided substantial assistance to MBI's false or misleading proxy statement.

97.     By reason of the foregoing, defendant Absi aided and abetted violations by MBI of Section 14(a) of the Exchange Act [15 U.S.C. § 78n(a)] and Rules 14a-3 and 14a-9 thereunder [17 C.F.R. §§ 240.14a-3 and 240.14a-9], and unless restrained and enjoined, will continue to aid and abet such violations.

## RELIEF REQUESTED

WHEREFORE, the Commission respectfully requests that the Court:

### I.

Permanently enjoin defendant Absi from directly or indirectly violating the applicable provisions and rules of the Federal securities laws as alleged and asserted above.

### II.

Pursuant to Section 20(e) of the Securities Act [15 U.S.C. § 77t(e)] and Section 21(d)(2) of the Exchange Act [15 U.S.C. § 78u(d)(2)], prohibit defendant Absi from serving as an officer or director of any entity having a class of securities registered with the Commission pursuant to Section 12 of the Exchange Act [15 U.S.C. § 78*l*] or that is required to file reports pursuant to Section 15(d) of the Exchange Act [15 U.S.C. § 78o(d)].

### III.

Order defendant Absi to disgorge all wrongfully obtained benefits, including prejudgment interest.

### IV.

Order defendant Absi to pay civil penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d) of the Exchange Act [15 U.S.C. § 78u(d)].

### V.

Retain jurisdiction of this action in accordance with the principles of equity and the Federal Rules of Civil Procedure in order to implement and carry out the terms of all orders and decrees that may be entered, or to entertain any suitable application or motion for additional relief within the jurisdiction of this Court.

1

**VI.**

2

      Grant such other and further relief as this Court may determine to be just, equitable, and

3

necessary.

4

Dated:  February 17, 2016            Respectfully submitted,

5

6

                         */s/ Joseph P. Ceglio*

7

                         Attorneys for Plaintiff

8

                         SECURITIES AND EXCHANGE
                         COMMISSION

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28